IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| VS. | § | CRIMINAL NO. H-08-028 |
| | § | |
| | § | |
| BRODERICK JERMAINE DAVIS | § | |

**ORDER DENYING MOTION FOR RECONSIDERATION**

The United States filed a motion and amended motions for reconsideration of this court's order granting Defendant Broderick Jermaine Davis's motion to suppress. The United States asks this court to reconsider its conclusion that Houston Police Department Sergeant Larry Satterwhite did not have reasonable suspicion to stop Davis on August 20, 2007. Davis has responded. Based on a careful review of the motions, the responses, and the applicable law, this court denies the United States's motion for reconsideration. The reasons for this ruling are set out in detail below.

**I.     Background**

On August 20, 2007, Sergeant Satterwhite and his partner, Sergeant Colin Howard, were on patrol at the Riverbanks Apartments. The apartments are located in a high-crime area of Houston, Texas. The officers arrived at the apartment complex at about 9:30 p.m. as part of a plan to converge on an area in a central courtyard within the complex. As they moved toward the area, the officers saw Davis seated near a stairwell with other individuals. At the suppression hearing, Sgt. Satterwhite testified that he thought he recognized Davis as

someone he had encountered previously but had no specific recollection. There was no evidence of criminal activity at that time.

The two officers proceeded to the courtyard area. They found no activity and returned the way they came, walking next to each other on the narrow sidewalk. The officers saw Davis walking toward them on the sidewalk. At this point, Satterwhite thought that he recognized Davis as someone with some gang connection and some type of criminal history, though again Satterwhite did not recall specifics. Davis was wearing an oversized baggy t-shirt and sagging shorts. Sgt. Satterwhite testified that when he first saw Davis – before Davis had time to react to seeing the officers – Davis was walking at a normal pace, with his right hand holding his clothing near his waist and his left hand swinging free. Satterwhite testified that when Davis saw the officers walking toward him, Davis's face changed to a nervous or "panicked" expression, and his hand holding the clothing near his waist "clutched" a bit more tightly. (Docket Entry No. 23, Transcript of Suppression Hearing at 49:13-14). Satterwhite noticed that where Davis was holding his oversized t-shirt and sagging shorts, the fabric bulged.

At the suppression hearing, Satterwhite testified that individuals may carry concealed weapons in a waistband. (*Id.* at 19:10-15). He testified about training he had received in a maneuver used by armed criminals called the "tap and turn." When a person illegally carrying a weapon sees police, that person holds the weapon in place at the waist area as he walks very quickly away from the officers. (*Id.* at 19:17-24). On cross-examination, Satterwhite also testified that it is a common fashion for young people to wear baggy pants

and to clutch the clothing in waist area when they walk around. (*Id.* at 33:15-22). Satterwhite also agreed that the fabric of baggy clothing, such as oversized t-shirts, may bulge when clutched. (*Id.* at 35:21-24).

As Davis got closer to Sgts. Satterwhite and Howard, he stepped off the sidewalk and continued walking toward the officers. Satterwhite testified that it would have been a tight squeeze for Davis to stay on the sidewalk with the officers. As Davis stepped off the sidewalk, Satterwhite said to Davis, "Don't I know you?" Davis may have said something in response, but Satterwhite did not recall what it was. Satterwhite then said, "I'd like to talk to you, but I want to make sure you don't have any weapons on you." Davis promptly stopped, complying with the officer's request. Sgt. Satterwhite immediately touched the bulging area near Davis's waistline and felt the butt of a gun. The gun was found between the middle and the left pocket area of Davis's shorts. Satterwhite did not recall that Davis was wearing any kind of belt.

Davis was indicted for being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the firearm, arguing that the officers lacked reasonable suspicion to engage in a *Terry* stop and frisk. The United States responded, and Davis filed a reply. On June 24, 2008, this court granted Davis's motion to suppress the firearm.

## II.     The Legal Standard

The legality of police investigatory stops is a two-part approach. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). The court first "examine[s] whether the officer's action was justified at its inception, and then inquire[s] whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)). Under *Terry*, "[p]olice officers may briefly detain individuals on the street, even though there is no probable cause to arrest them, if they have a reasonable suspicion that criminal activity is afoot." *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc). Reasonable suspicion is more than just a hunch; it "must be supported by particular and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant an intrusion." *Id.* at 840. If an officer has validly stopped a person suspected of criminal activity and reasonably believes the person is armed and dangerous, the officer may conduct a limited protective search for concealed weapons. *Terry*, 392 U.S. at 24.

The standard for reasonable suspicion is "not readily . . . reduced to a neat set of legal rules." *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996). Among the relevant considerations for determining reasonable suspicion are: whether the area where the stop occurred was a high-crime area, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); whether the individual engaged in unprovoked flight upon noticing the police, *Id.*; and whether the individual looked nervous or made furtive gestures or suspicious movements. *United States v. Watson*, 953 F.2d 895, 897 (5th Cir. 1992). None of these factors, standing alone, creates

reasonable suspicion to stop. The reasonableness of police conduct is measured by an objective standard, taking into account the totality of the circumstances. *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992). The Fourth Amendment is satisfied "[a]s long as all the facts and circumstances, viewed objectively, support the officer's decisions." *Id.*

### III.   Analysis

The United States argues that this court incorrectly applied the reasonable suspicion standard to the facts of this case. Specifically, the United States argues that Sgt. Satterwhite had reasonable suspicion that crime was afoot because: the encounter took place in a high-crime area at night; Satterwhite remembered that Davis had some gang connection and some type of criminal history; Davis was described as looking nervous or "panicked" when he saw the officers; Davis was wearing baggy clothing and clutching the waist area of his sagging shorts; Davis clutched that area a bit more tightly when he saw the officers; and Satterwhite noticed a fabric bulge where Davis was clutching his clothing near his waist.

The United States is correct that courts have cited these factors in finding reasonable suspicion. But in these cases, the factors the United States relies on were not the only basis for reasonable suspicion. Instead, the cases that approved a *Terry* stop all involved additional factors—such as unprovoked flight, evasion, an informant's tip, or other activity consistent with crime—to support reasonable suspicion that criminal activity was afoot.

In cases involving high-crime areas where the defendant grabbed or held his waistband in a manner consistent with possession of a concealed firearm, courts have found reasonable suspicion when the defendant also fled upon seeing the police. *United States v.*

*Hart*, 2006 WL 851172 at *2 (E.D. La. Mar. 14, 2006) (defendant saw police, immediately placed hands on waistband, then turned and headed toward front door of house); *United States v. Sutton*, 2001 WL 238221 (E.D. La. Mar. 9, 2001) (defendant saw police, grabbed waistband, turned and ran away from officers). Although neither presence in a high-crime area nor flight alone are indicative of suspicious behavior, "unprovoked flight upon noticing the police" justifies suspecting that an individual is engaged in criminal activity. *Wardlow*, 528 U.S. at 121. "Headlong flight . . . is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* In prosecutions involving a felon in possession of a firearm, courts have found reasonable suspicion in cases in which an individual fled from police in a high-crime area. *See United States v. Williams*, 79 Fed. Appx. 677, 681 (5th Cir. 2003) (defendant saw policeman, changed directions and began jogging, then removed something from his pocket and placed it in his mouth); *United States v. Lawson*, 233 Fed. Appx. 367, 370 (5th Cir. 2007) (officer asked defendant to talk with him, defendant acted nervous and ran away); *United States v. Jordan*, 232 F.3d 447, 449 (5th Cir. 2000) (officers saw defendant running at a full sprint from the direction of a store, looking back over his shoulder).

In other weapons-possession cases in which the defendant's hand went toward his waistband, the officers had other reasons to suspect that the defendant was engaged in criminal activity. *United States v. Gooden*, 2000 WL 1092856 (E.D. La. Mar. 2, 2000); *United States v. Samuels*, 131 Fed. Appx. 859, 862-63 (3d Cir. 2005). In *Gooden*, the police responded to a tip that a robbery might take place at a tattoo shop in a high-crime area. 2000

WL 1092856 at *1. An informant had given the police a description of a man inside the shop who had a gun in his waistband. *Id.* When the police arrived, the defendant, who fit the description, made eye contact with the officers and grabbed for his waist. *Id.* Based on the totality of the circumstances, the court held that the officer had reasonable suspicion to stop and frisk the defendant. Id. at *4. In *Samuels*, officers responded to an anonymous tip about a man with a gun. 131 Fed. Appx. at 860-61. The police found the defendant at the location described in the tip, a high-crime area, with a visible bulge in his waistband. *Id.* The defendant was acting nervous and when ordered to put his hands up, continued to move his hand toward his waist. *Id.* at 862-63. The court held that the officers had reasonable suspicion to stop the defendant. *Id.* at 863. *See also United States v. Goddard*, 491 F.3d 457, 462 (D.C. Cir. 2007) (officers had reasonable suspicion when defendant held the right side of his waistband and declared that he had a gun).

Courts have denied motions to suppress a firearm when the gun was found on a defendant whom the police suspected was involved with a stolen vehicle. *United States v. Santio*, 2007 WL 4270537 (D. Utah Nov. 30, 2007); *United States v. Tuggle*, 2008 WL 2725482 (5th Cir. July 14, 2008). In *Santio*, the police were in a high-crime area staking out an unoccupied stolen vehicle, which the defendant approached. *Id.* at *1. The defendant appeared "fidgety" and "suspicious" and "kept looking the area over" for a minute or two. As he walked by the unmarked police car, the detective noticed gang-related clothing and baggy pants, "which could conceal anything." But the high-crime area, specific indication of gang affiliation, and baggy clothing was not the only basis for the stop. The detective

7

pulled behind the defendant and turned on his emergency lights. The defendant kept walking, then finally stopped. The court, emphasizing the detective's belief that the defendant had a connection to the stolen vehicle, held that there was reasonable suspicion to stop the defendant. Id. at *3. In *Tuggle*, officers approached a residence in a high-crime area suspected of housing stolen vehicles and confirmed that one of the cars parked in the yard was stolen. 2008 WL 2725482 at *1. The officers noticed the defendant leaning into the driver's side window of an idle vehicle in front of the residence. *Id.* As the officers arrived, the vehicle sped away and the defendant walked briskly away from the officers and toward the stolen car in the yard. *Id.* at *2. The court held that the officers had reasonable suspicion to stop the defendant. *Id.* at *7.

"While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 120. The case law shows that in this case, the required minimal level of objective justification for making the stop was not met. The government has not cited cases in which a court has found reasonable suspicion based on similar facts, in the absence of some additional factor such as flight, failure to comply with police orders, an informant's tip, or other apparent connection to current or recent criminal activity.

Sgt. Satterwhite testified that he had been trained that individuals who have a weapon concealed under clothing and see police approaching will engage in a "tap and turn" maneuver. But Satterwhite's description of what he observed Davis do when he saw the

8

officers approach is inconsistent with such a "tap and turn" maneuver. When he first saw the police, Davis did not begin to clutch his waist and walk quickly away from the police. Instead, Davis was *already* clutching his saggy pants through his oversized t-shirt while he walked, before he saw the police. When Davis saw the police, he continued to walk in the same direction and pace and continued to clutch his saggy pants through his oversized t-shirt as he walked toward the officers.

The fact that Davis stepped off the sidewalk as he got closer to the police is not indicative or even suggestive of criminal activity. Unless there is reasonable suspicion to stop, an individual has a right to ignore the police and "go on his way." *Florida v. Royer*, 460 U.S. 491, 498 (1983).

"[T]he relevant inquiry is not whether the particular conduct is 'innocent' or 'guilty' but the degree of suspicion that attaches to particular types of noncriminal acts." *United States v. Sokolow*, 490 U.S. 1, 10 (1989). The approach urged by the government would allow a stop and frisk whenever an officer in a high-crime area encounters an individual with a criminal history who wears baggy clothing, including pants so saggy and loose they have to be held up,[1] appears nervous in reaction to seeing the police, but does not try to evade or flee. Finding reasonable suspicion here does not merely recognize that some innocent people may be permissibly stopped, but would cast a much wider net.

---

[1] Sergeant Satterwhite testified he did not recall whether Davis was wearing a belt to hold up his pants. (Docket Entry No. 23, Transcript of Suppression Hearing at 27:5-13).

In its third amended motion for reconsideration, the United States argues that the "public safety" exception to *Miranda* set forth in *New York v. Quarles*, 467 U.S. 649, 655-56 (1984), should apply with equal force to the suppression analysis for a *Terry* stop. The public safety exception has not been applied outside the context of *Miranda's* prophylactic Fifth Amendment rule. Under *Terry*, an officer's reasonable suspicion that an individual is armed and dangerous only comes into play to justify a "frisk," after a valid "stop" has already occurred. 392 U.S. at 32-33 (Harlan, J., concurring) (the officer must first have constitutional grounds to make a forcible stop before the officer can frisk); *see also Adams v. Williams*, 407 U.S. 143, 146 (1982) ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose."). Because Satterwhite did not have reasonable suspicion that criminal activity was afoot, the stop of Davis was not justified under *Terry*.

**IV.     Conclusion**

The United States's motion for reconsideration of this court's order granting Davis's motion to suppress is denied.

SIGNED on September 22, 2008, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge